UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
AT LOUISVILLE

CIVIL ACTION NO. 3:08-CV-338-H

SHARON RAMAGE                                                              PLAINTIFF

V.

LOUISVILLE/JEFFERSON COUNTY                          DEFENDANTS
METRO GOVERNMENT &
DAN JACKMAN

**MEMORANDUM OPINION**

Plaintiff, Sharon Ramage, brings this §1983 action claiming that the Louisville Metro Police Department ("LMPD") violated her Fourth and Fourteenth Amendment rights when they executed a valid search warrant for her property in an excessive and unreasonable manner. All parties have moved for summary judgment based on particular undisputed facts.

This is a difficult case because, in retrospect, certain actions of the police appear to have been ill-advised or unnecessary. The Court's role, however, is not to hand out misconduct slips, but rather to analyze whether any actions exceeded constitutional limits. To do so requires extensive and serious analysis of the search and the circumstances surrounding it.

**I.**

The following facts are undisputed and relevant to the pending motions. It appears that additional disputed facts may exist and may form additional bases for Plaintiff's claims.

On June 20, 2007, the LMPD received a phone call from the manager of a national photo development company. He informed the police department that he had discovered photographs of nude children, including photos depicting nude children with a nude male adult. He described some as graphic in nature. The customer information on the envelope containing the film read,

"Sharon Ramage; 5525 Beth, Louisville, KY 40219." Police officers reviewed county records and determined that Sharon Ramage owned the property located at 5525 Beth Drive and that the adult male in the photographs was her son, Michael Ramage ("Michael"). According to criminal history and driver's license records, Michael resided at his mother's address.

On June 25, 2007, based on the above information, Detective Dan Jackman sought and obtained a search warrant for 5525 Beth Drive. Consistent with LMPD policy, Jackman also prepared a risk assessment matrix ("the matrix"), which LMPD uses to determine the risk level for a given search and the need for special forces in executing the warrant. The matrix applies multiple factors to a set formula of risks. Whenever the matrix total exceeds a specified amount, LMPD utilizes the SWAT team to secure the property before conducting an actual search.

Here, two important factors increased the matrix's risk assessment. First, the size and security of the property created risk. Plaintiff's property is 16 acres, includes three separate buildings and is fully fenced. A large, rod iron gate sits across the driveway of the property and the home features iron security doors. Based on these facts, the matrix considered the property "fortified," which simply means that its breach required special tools and experience. Second, the criminal history of the primary suspect, Michael, created risk. Jackman reasonably believed Michael was living at the home. An arrest record showed that he had been charged with 19 crimes from 1997 to 2007: 9 drug related charges, 2 wanton endangerment charges, 1 tampering with physical evidence charge, 2 gun related charges, 1 menacing charge, 1 arson charge, 1 burglary charge, 1 intimidation of a witness charge and 1 child abuse charge. Based on his criminal record, the matrix designated Michael a potential threat to officer safety. This factor added significant points to the matrix's risk assessment.

Det. Jackman reviewed the matrix with his supervisor and determined that based on the matrix total, LMPD policy required SWAT team assistance. Jackman had no further involvement with the planning or preparation of the SWAT team's actions. He had no authority over SWAT team members and did not control their use of force to secure the property during the execution of the search warrant.

On June 25, the evening of the search, at 9:30 pm approximately 30 members of the SWAT team secured the premises (including the three separate buildings) before detectives entered. On that night, the "fortified" gate was standing open when the officers arrived. SWAT members entered the home from the front and rear doors simultaneously to ensure safety. Upon doing so, they discovered that the front door was unlocked and entered through it. The rear door was securely locked, so the officers broke it down. Upon entry, at least one officer drew his weapon. One member entered from the front door and approached Plaintiff on one side; another entered from the rear door and approached Plaintiff from the other side. The officers grabbed Plaintiff, turned her around, forced her to the ground and placed her in plastic cuffs. From that time forward, Plaintiff did not see a gun. It appears she was no longer physically restrained by the officers, though the cuffs were left in place. After all three buildings were secured, detectives entered the property to execute the search warrant.

At this stage of the proceedings, only the SWAT team's actions during the very brief preliminary encounter are the subject of Plaintiff's constitutional claims. All parties have moved for summary judgment on a variety of grounds. The Court will consider each in turn.

**II.**

Detective Jackman claims that he is not legally responsible for the SWAT team's actions. Plaintiff does not allege that Jackman did anything other than prepare the search warrant application and fill out the matrix. Nevertheless, she claims that this amounts to a request for SWAT assistance and makes Jackman liable for their actions. For the reasons that follow, the Court concludes that these allegations do not support liability against Jackman under § 1983.

As a general rule, to be liable under § 1983, a defendant must have done something more than know of an action and fail to stop it. Personal liability of *supervisory* personnel "must be based on more than merely the right to control employees. Without more, such a theory would allow liability on a respondeat superior basis - a basis expressly rejected by the Supreme Court in *Monell v. Dep't of Soc. Services*, 436 U.S. 658 (1978)." *Hays v. Jefferson County, Ky.*, 668 F.2d 869, 872 (6th Cir. 1982). In essence, there must be "a showing that the official either encouraged the specific incident of misconduct or in some other way directly participated in it. At a minimum a plaintiff must show that the official at least implicitly authorized, approved, or knowingly acquiesced in the unconstitutional conduct of the offending officers." *Id.* at 874; *see also Shehee v. Luttrell*, 199 F.3d 295, 300 (6th Cir. 1999). Where a defendant has no control over the individuals engaged in the unconstitutional conduct, he cannot be liable for it. *Shehee*, 199 F.3d at 300-01 (finding that defendants who instigated a course of conduct leading to an allegedly unconstitutional termination could not be liable for it because they had no authority over the persons responsible for the termination and played no active role in the termination).

It is undisputed that once the matrix form was completed, which as discussed below was constitutionally permissible, Jackman had no authority either over the final decision to use

4

SWAT or their actions. While there is some factual dispute over the discretion left to SWAT members in the execution of a search warrant, there is no dispute that Jackman lacked authority over them. In fact, according to standard LMPD procedure, Jackman and other detectives responsible for the actual search were not allowed in the buildings until SWAT had "secured" them. Plaintiff alleges no constitutional violations involving officers other than SWAT team members responsible for securing the premises. Put simply, Jackman did not have the requisite involvement in the allegedly unconstitutional actions to be personally liable under § 1983.

### III.

LMPD[1] moves for summary judgment on the ground that it is not liable for its employees' actions.[2] The Supreme Court described the circumstances for a governmental entity's § 1983 liability in *Monell v. New York City Dept. of Social Services*, 436 U.S. 658 (1978). A local governmental entity is considered a person within the meaning of § 1983. *Id.* at 662. However, it has no liability simply because its employee violates another's constitutional rights, *Id.* at 691, but rather, is liable only where the employee's act represents an official policy or custom of that government, *Id.* at 694. *See also Kentucky v. Graham*, 473 U.S. 159, 167 (1985). Since *Monell*, the Sixth Circuit has elaborated on the scope of municipal liability:

> While [local governing bodies are] not liable under respondent superior for an employee or officer's acts, it may be sued for having caused a constitutional tort

---

[1] LMPD is an arm of the Louisville/Jefferson County Metro Government and any damages will come from that entity. The Court refers to Defendant as LMPD for the sake of simplicity and clarity.

[2] It does not seek summary judgment on the basis that the SWAT team's actions were constitutionally reasonable as a matter of law. The Court assumes that this is because there are factual disputes not yet relayed to the Court. Thus, in considering LMPD's motion, the Court analyzes only whether LMPD could be liable for the SWAT team's actions if those actions are found to be unconstitutional. In the following section, the Court analyzes the viability of Plaintiff's claims and determines that some are meritless as a matter of law. Because these issues have been fully briefed, the Court will issue an Order consistent with that analysis.

5

through "a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers." Since such bodies can act only through natural persons, the critical question is whether the person committing the act did so pursuant to official policy. A formally adopted policy is not required; established usage or custom may be sufficient.

*Adkins v. Bd. of Educ. of Magoffin County, Ky.*, 982 F.2d 952, 957 (6th Cir. 1993).

Plaintiff claims that the following SWAT team actions were unconstitutional: (1) using a flashbang device before entering the home; (2) breaking down the back door when the front door was unlocked; (3) aiming a gun at Plaintiff who presented no apparent danger to officer security; and (4) forcing Plaintiff to the ground and putting here in plastic cuffs. According to LMPD, SWAT team leaders exercised their own discretion in executing the warrant, rather than following a particular department custom or policy. However, Jackman testified that SWAT officers routinely take the actions described here and that the officers executed this search warrant according to LMPD policy. LMPD counters that Jackman is not credible on this point because he is not a member of the SWAT team or a SWAT supervisor.

The Court concludes that sufficient evidence would permit a reasonable jury to find that the SWAT team followed certain customs and policies when it entered the residence with guns drawn and secured the residence in the manner described. The Court will next consider whether use of the matrix or any of the specified actions could support a § 1983 claim.

**IV.**

Plaintiff's first argument in support of her motion for summary judgment is that any use of the matrix is facially unconstitutional. She claims that the matrix is a mere "mathematical formula" that removes consideration of the individual circumstances surrounding the execution of a warrant and, therefore, does not meet the constitutional requirement that those

6

circumstances be taken into consideration when determining the reasonableness of the officer's search. The Court disagrees.

The matrix is, itself, a consideration of the circumstances surrounding the specific search. For example, in this case LMPD considered the property to be searched, the need for specialized equipment to breach the gates and doors, and the potential threat to officer security created by Michael's prior violent criminal record. Thus, the matrix is the embodiment of making a case by case decision based on the individualized circumstances of the search warrant to be executed. While this decision is made prior to the officers' arrival at the scene of the search, that does not make it unconstitutional. If officers waited until arriving at the scene and discovering that it was, in fact, dangerous before requesting SWAT team assistance, it may be too late. The matrix simply considers the risks inherent in the particular search and determines when the SWAT team should be deployed. To use it does not create a per se constitutional violation.

## V.

Plaintiff also argues that certain of the SWAT team's undisputed actions violated her rights as a matter of law.[3] During this analysis, it is important to remember that LMPD was authorized to enter Plaintiff's home and conduct a thorough search for any evidence of crimes against children. The only basis for a Fourth Amendment violation is Plaintiff's claim that LMPD executed the search warrant in an unreasonable manner. To assess this, the Court must

> focus upon the governmental interest which allegedly justifies official intrusion upon the constitutionally protected interests of the private citizen, for there is no ready test for determining reasonableness other than by balancing the need to search (or seize) against the invasion which the search (or seizure) entails. And in justifying the

---

[3] Again, only Plaintiff seeks summary judgment on the merits of the case. However, in conducting this analysis, the Court will consider whether the undisputed facts standing alone can possibly create liability. Where they cannot, the Court finds it appropriate to enter judgment for LMPD.

> particular intrusion the police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion. The scheme of the Fourth Amendment becomes meaningful only when it is assured that at some point the conduct of those charged with enforcing the laws can be subjected to the more detached, neutral scrutiny of a judge who must evaluate the reasonableness of a particular search or seizure in light of the particular circumstances. And in making that assessment it is imperative that the facts be judged against an objective standard: would the facts available to the officer at the moment of the seizure or the search warrant a man of reasonable caution in the belief that the action taken was appropriate?

*Terry v. Ohio*, 392 U.S. 1, 20-22 (1968) (quotations omitted).

Plaintiff argues that it was unreasonable to use SWAT forces at all in securing the premises prior to searching. Largely, Plaintiff makes this broad assertion based on what actually transpired at the search: only Plaintiff was home, she presented no danger and no evidence of a crime was found. However, those circumstances were unknown to the officers at the time the search warrant was executed. Rather, the officers had evidence of child pornography, that the suspect resided at Plaintiff's address, that the property was large and had multiple buildings that presented numerous safety concerns, and that the suspect had a significant criminal history including violent crimes and weapons charges. Based on this information, the officers could reasonably perceive a threat to officer safety at Plaintiff's residence and reasonably believe that the use of SWAT forces may be necessary and appropriate. Moreover, rarely do officers know the need for extra precautions simply by looking at the exterior of a building. The Court, or a jury, should avoid twenty-twenty hindsight to second-guess police officers' decisions. The officers' actions must be judged based on their knowledge at the time. Finally, and most importantly, simply bringing along the SWAT team does not create liability for the LMPD. Rather, the Court must look at the specific acts of the SWAT team and determine whether those acts violated Plaintiff's rights as a matter of law.

## A.

Plaintiff first complains that it was unreasonable for the SWAT team to detonate a flashbang device, which is an incendiary device that creates a bright white flash and an extremely loud "bang" noise. It is designed to stun the occupants of the home in an effort to prevent them from creating a danger to officer safety upon entry. Here, the officers detonated the device outside as they approached Plaintiff's home. In essence, the device's only effect on individuals inside the home was a loud noise.

The Sixth Circuit has previously considered the use of a flashbang device in the Fourth Amendment context. *See United States v. Dawkins*, 83 Fed. Appx. 48 (6th Cir. 2003). In *Dawkins*, police secured a search warrant for the defendant's residence. The officers had received reports from confidential informants that the defendant possessed a high-powered firearm and the officers knew that the defendant was a convicted felon and a suspected gang member. When they arrived at the home, the officers knocked and announced their presence, waited 15 seconds without response, and broke down the door. Immediately upon entry, the officers detonated a flashbang device, which caused some property damage. The Sixth Circuit considered whether the use of the flashbang was unconstitutional and held,

> The use of a flash-bang is neither per se objectively reasonable nor unreasonable. Instead, the reasonableness of the device's use . . . depends upon the facts and circumstances of each case. Under the circumstances of the present case, we find the officers' use of the flash-bang diversionary device to be objectively reasonable. . . . [W]here, as here, the officers had evidence that a violent felon possessed high-powered weapons, it would strain credulity to find that the Fourth Amendment's reasonableness requirement precluded the officers from using a device intended to reduce the risks to all parties associated with entry.

*Id.* at 51 (quotations omitted).

Our case shares some similarities and some distinctions with *Dawkins*. Like *Dawkins*,

9

the officers here reasonably believed (1) that Michael had a long criminal history including multiple violent felonies (i.e. arson, burglary, child abuse and wanton endangerment), and (2) that Michael was residing at the premises to be searched. While our officers did not have direct notice that Michael possessed a firearm at that time, the officers did know that Michael had been charged with two gun related crimes, including being a convicted felon in possession of a hand gun as recently as 2007. These similarities are likely sufficient to bring our case within the confines of the *Dawkins* analysis.

Any doubt as to the reasonableness of the officers' deployment of the flashbang device can be resolved by the method of deployment. Generally, the use of flashbangs is questioned because it presents a danger to the occupants when deployed inside a building. *See, e.g.*, *United States v. Myers*, 106 F.3d 936, 940 (10th Cir. 1997) ("The use of a 'flashbang' device in a house where innocent and unsuspecting children sleep gives us great pause."). Here, however, the flashbang device detonated outside, and, thus, Plaintiff's only interest appears to be avoiding the extremely loud noise. When weighing that interest against the officers' interest in their own safety based on the criminal history of the suspect, the Court determines that the officers' use of the flashbang outside the home was objectively reasonable. *See Graham v. Connor*, 490 U.S. 386, 396 (1989) (holding that whether an officer's use of force is excessive depends on a weighing of the nature and quality of the individual's interests against the interests of the government). Thus, the use of the flashbang device outside Plaintiff's home, without more, did not violate Plaintiff's constitutional rights.

**B.**

Second, Plaintiff asserts that it was unreasonable to break down the back door when the officers had gained entry through the unlocked front door. Again, LMPD asserts that officers breached the back door out of concern for officer safety.[4] The Court finds that the officers' actions were reasonable under the circumstances.

The SWAT team intended to secure the building prior to a search. Use of the SWAT team to do so was reasonable in light of Michael's violent criminal record. Moreover, it makes sense to secure all entrances and exits to the building. Entering the building from both points could provide more officers in more locations to ensure safety. Without entering through the back door, individuals in the home could have surprised officers as they entered from the front. Like the use of the flashbang device, breaking down the rear door, standing alone, was not a constitutional violation.

## C.

Third, Plaintiff claims that aiming a gun at her upon entry to the residence and detaining her using plastic cuffs during the search violated her rights. First, it is necessary to be clear on the facts alleged by Plaintiff. In her briefs, Plaintiff describes the officers' actions as "detaining her at gunpoint." Certainly, if the officers aimed a gun at her head for the entirety of the search, there could be a constitutional violation. However, a review of Plaintiff's deposition shows that was not the case. Rather, Plaintiff testified that the officers entered her home and at least one had his weapon drawn. Immediately, two other officers "slammed [her] around" and "subdued" her. (Pl.'s Dep. 58:23 - 59:21.) After the point when she was "slammed around," she never saw

---

[4] For purpose of this motion, the Court assumes that the officers complied with the knock and announce requirements, a fact disputed by the parties. Of course, if SWAT failed to knock and announce its presence, such a failure could be a constitutional violation depending on the existence of any exigent circumstances.

a gun the rest of the night. (Pl.'s Dep. 59:12-22.) Thus, Plaintiff saw a gun no more than a matter of seconds; she was not "detained at gunpoint."

The U.S. Supreme Court considered similar facts in *Muehler v. Mena*, 544 U.S. 93 (2005). There, police obtained a search warrant for a residential home where they believed a gang member involved in a drive-by shooting lived, along with numerous other individuals. Based on this information, the SWAT team "was used to secure the residence and grounds before the search." *Id.* at 96. The plaintiff, suing under § 1983 for Fourth Amendment violations, "was asleep in her bed when the SWAT team, clad in helmets and black vests adorned with badges and the word 'POLICE,' entered her bedroom and placed her in handcuffs at gunpoint." *Id.* She was kept in cuffs for the duration of the search, which lasted two to three hours, and was guarded by one or two officers during the search. The plaintiff was not a gang member, was not involved in the drive-by and obviously presented no immediate danger given the fact that she was asleep when SWAT arrived. The Supreme Court held,

> [The plaintiff's] detention was, under *Summers*, plainly permissible. An officer's authority to detain incident to a search is categorical; it does not depend on the 'quantum of proof justifying detention or the extent of the intrusion to be imposed by the seizure. Thus, [the plaintiff's] detention for the duration of the search was reasonable under *Summers* because a warrant existed to search 1363 Patricia Avenue and she was an occupant of that address at the time of the search.

*Id.* at 98 (citing *Michigan v. Summers*, 452 U.S. 692, 705 (1981)). The Court further clarified that the use of handcuffs for the entire period of the search was reasonable given the officers' reasonable belief that the home presented a safety risk. *Id.* at 100.

In light of *Muehler*, the outcome here is apparent. The officers here reasonably believed that the premises to be search presented a threat to officer safety. They believed that Michael could be present in the home and they knew that his criminal history included violent offenses

and weapons charges. Like *Muehler*, Plaintiff was simply an innocent occupant of the same residence as the perceived dangerous suspect and presented no immediate recognizable threat to officer safety upon entry to the home. Given these similarities, the Court finds that it was reasonable for the officers to have their weapons drawn upon entry and to detain Plaintiff in plastic cuffs during the search.

## D.

Finally, Plaintiff alleges that SWAT team members cursed at her. LMPD disputes this fact. However, even assuming Plaintiff's version of the facts to be true, her claim cannot proceed. This Court has previously recognized that

> [i]t is well established that a claim based on vulgar or abusive language is insufficient to state a constitutional deprivation. *See Oltarzewski v. Ruggiero,* 830 F.2d 136 (9th Cir.1987). This holding was cited with approval by the Sixth Circuit in *Schrader v. Patrick,* 181 F.3d 103 (6th Cir.1999). [The officer's] cursing at or verbal abuse of Plaintiff does not constitute a constitutional violation as a matter of law.

*O'Connell ex rel. O'Connell v. Louisville Metro Police Dept.*, No. 3:03-CV-589-H, 2006 WL 561240, at *3 (W.D. Ky. Mar. 3, 2006).

## VI.

Based on the preceding analysis, the Court seeks to clarify the current status of the case. At this time, Defendant Jackman is wholly dismissed from the lawsuit. Defendant Louisville/Jefferson County Metro Government is still a party to the lawsuit based upon the allegation that its employees took unconstitutional actions pursuant to an official policy or custom. However, the Court finds that the following actions, taken alone, did not violate Plaintiff's Constitutional rights: (1) the use of the matrix; (2) the use of the SWAT team generally; (3) deployment of one flashbang device outside the residence; (4) breaking down the

rear door; (5) entering the residence with guns drawn; (6) detaining Plaintiff in handcuffs during the search; or (7) cursing at Plaintiff.  This is not to say, however, that those actions will be wholly irrelevant to Plaintiff's case at a trial.  Plaintiff may base her claims on the totality of the circumstances.  The above actions, combined with other disputed facts, may support Plaintiff's claim of constitutional violations.

The Court will issue an Order consistent with this Memorandum Opinion.

cc:     Counsel of Record